[No. 42814-4-I.    Division One.    January 18, 2000.]

YOLANDA MIRANDA, ET AL., *Appellants*, v. RONALD C. SIMS, ET AL., *Respondents*.

*Theodore F. Spearman,* for appellants.

*Norm Maleng, Prosecuting Attorney, Thomas William Kuffel, Senior Deputy,* and *Jeffrey Allen Richard, Deputy,* for respondents.

COLEMAN, J. — Yolanda Miranda, the mother of Robert Wayne Guy Jr., and Dessiree Price, the mother and guardian of Guy's son, appeal a superior court ruling denying them reimbursement for attorney fees and costs for their participation in an inquest into Guy's death while in police custody. In King County, family members of the deceased have a right to participate in inquest proceedings but are not entitled to counsel at public expense. Guy's family

members are indigent and argue that appointed counsel is necessary to protect their right to participate in the inquest. They further argue that the denial of counsel at public expense violates their right to equal protection under the state and federal constitutions. We conclude that the family has no constitutional right to representation in such proceedings and that this conclusion is not affected by the County's provision of representation for its agents and employees. Therefore, we affirm.

## FACTS

On December 27, 1997, the King County police stopped Robert Wayne Guy Jr. for speeding and discovered various outstanding warrants. Guy was arrested on misdemeanor charges and taken to the county jail. On December 29, Guy began to act out and threw himself headfirst against a cement wall. Jail personnel handcuffed Guy and placed him in restraints. When Guy became suddenly quiet, the jail contacted its medical staff and all restraints were removed. Guy went into a coma and was transported to Harborview Medical Center, where he died five days later. The autopsy report indicated that Guy had cocaine in his system and had sustained a heart attack. Because Guy had been in police custody, the prosecuting attorney's office requested the County Executive, Ron Sims, to convene an inquest into his death. On February 10, 1998, Sims ordered an inquest and requested that a district court judge be assigned to conduct the proceedings. District Court Judge Mark Chow was assigned.

Under the KING COUNTY CODE (KCC), the County Executive has the authority to conduct inquests. KCC 2.24.110(A). Executive order PHL 7-1 (AEP) sets forth procedures that permit family members of the deceased to participate in inquest proceedings but does not provide for their representationat public expense.[1] Guy's family is indigent and sought reimbursement for their attorney fees and the costs

---

[1]The County's policies provide that participants in the inquest shall include:

a) The King County Prosecuting Attorney or designee;

for their participation, which was denied. County employees, however, including correction officers and health services workers, were represented by attorneys who were paid by the County.

The family filed a declaratory judgment action in superior court challenging the constitutionality of the County's policies and seeking to prevent the inquest from proceeding unless they received reimbursement for their expenses. Counsel for the family submitted a declaration indicating that he was not able to perform a substantial amount of document review, discovery, and investigation required to prepare for the proceeding, including numerous interviews and toxicological and pathological consultations. The court denied the family's motion for an injunction and dissolved a temporary restraining order staying the inquest. A panel of this court denied emergency relief from the order. Because the inquest was proceeding with the participation of the family's counsel, the Supreme Court determined that injunctive relief was not necessary and denied review. On November 20, 1998, the inquest jury returned a verdict finding that County personnel were not responsible for Guy's death.

Guy's family appealed the Superior Court order denying their motion for a preliminary injunction. The family also moved to supplement the record with additional evidence, including two declarations from their attorney. The declarations indicate that the family incurred approximately $64,000 for legal services and $4,982.65 in costs for their

---

b) The family of the deceased, who shall be allowed to have an attorney(s) present; and

c) The person(s) involved in the death, if known, who shall be allowed to have an attorney(s) present, provided that the civil interests of such person(s) and their employing government department(s) shall be allowed to be represented by a lawfully appointed attorney.

PHL 7-1 (AEP) App. 9.1 § 2 (amended 1991). But the policies also provide, "There is no right to counsel at public expense for indigents involved in an inquest." PHL 7-1 (AEP) § 6.9.

participation in the inquest. Counsel also states in the declarations that after the inquest jury returned its verdict, he learned that some of the testimony presented was not true and that the prosecutor's office has since reopened its investigation into Guy's death. We grant the motion to supplement. But after considering the declarations, we find that the additional information is not germane to our analysis of the issues presented in this appeal.

## DISCUSSION

Guy's family first contends that the County's denial of funds for their representation conflicts with their constitutional right of access to the courts, citing *Doe v. Puget Sound Blood Ctr.*, 117 Wn.2d 772, 819 P.2d 370 (1991). In *Puget Sound*, the court affirmed a discovery ruling that required the blood center to disclose who had donated the contaminated blood that the plaintiff had received. The court based its decision, in part, on the plaintiff's substantial right to be indemnified for his injuries and his right of access to the courts under article I, section 10 of our state constitution. *See Puget Sound*, 117 Wn.2d at 782-83. The civil litigant's right of access, however, has never been construed by our courts to provide a right to counsel at public expense in every proceeding. Rather, our courts have limited the right to appointed counsel in civil cases to proceedings where the litigant's physical liberty is threatened or where a fundamental liberty interest, similar to the parent-child relationship, is at risk. *In re Dependency of Grove*, 127 Wn.2d 221, 237, 897 P.2d 1252 (1995).

In addition, our courts have held that our state constitution protects a right of access only in cases in which a controversy is resolved or punishment is determined. *See Seattle Times Co. v. Eberharter*, 105 Wn.2d 144, 156, 713 P.2d 710 (1986) (noting that the right has been applied to matters that are part of "the process of determining guilt or innocence" and not to investigatory proceedings). In the

instant case, the proceeding at issue is a nonbinding factual inquiry and does not result in a determination of guilt or responsibility. *See Carrick v. Locke*, 125 Wn.2d 129, 133, 882 P.2d 173 (1994) (citing *State v. Ogle*, 78 Wn.2d 86, 88, 469 P.2d 918 (1970)). The purpose of an inquest is to determine the identity of the deceased, the cause of death, and the circumstances of the death, including an identification of any actors who may be criminally liable. RCW 36.24.040; *Carrick*, 125 Wn.2d at 133. Nevertheless, our courts have repeatedly rejected the argument that an inquest is equivalent to a trial.

■ Guy's family, however, argues that appointed counsel is necessary to ensure that their interests are represented and that their right to participate in the inquest is meaningful. But contrary to the family's assertions, the family's interest in a fair proceeding, as well as the public's interest in a neutral inquiry into the County's responsibility for the death, are represented under the statutory scheme. The statutes contemplate a fair and objective inquiry. As stated above, the purpose of an inquest is to obtain an objective, nonpartisan, and independent opinion on the cause of death and the circumstances surrounding the death. *Carrick*, 125 Wn.2d at 143 (citing RCW 36.24.020 and RCW 36.24.040). To this end, the coroner must examine all individuals who have, in the coroner or jury's opinion, "any knowledge of the facts." *See* RCW 36.24.050; *Carrick*, 125 Wn.2d at 144 n.9. In the instant case, the prosecutor's office, which is charged by law to determine if a crime has been committed, also participated in the inquest. For these reasons, we reject the family's argument that appointed counsel is constitutionally required to protect their interests and right to participate in the inquest.

Guy's family next contends that the County's provision of counsel for the other participants in the proceedings violates their right to equal protection under the state and

federal constitutions. The family contends that the County policy denying indigent representation in inquest proceedings creates, in effect, two classes of participants: indigent family members of the deceased and indigent County employees.

Guy's family contends that article I, section 12 of our state constitution provides greater protection in the context of such proceedings, but failed to present an analysis applying the criteria set forth in *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808, 76 A.L.R.4TH 517 (1986) until their reply brief. The respondents moved to strike the *Gunwall* analysis, arguing that it was not presented in a timely manner. In light of our disposition of this issue, we conclude that there is no need for responsive briefing and deny the motion to strike.

■ In *Gunwall*, the court set forth six "nonexclusive neutral criteria" to direct the application of an independent state constitutional analysis in a given situation. *Id.* at 61-62. They are: (1) the text of the state constitution; (2) significant differences in the texts of the federal and state constitutions; (3) state constitutional and common law history; (4) preexisting state law; (5) differences in structure between the federal and state constitutions; and (6) matters of particular state interest or local concern. *Id.*

The first and second *Gunwall* criteria focus on the text of the state provision and its comparison with parallel federal provisions. *Id.* at 61. In arguing that the textual differences are significant in this context, Guy's family relies on Justice Utter's concurrence in *State v. Smith*, 117 Wn.2d 263, 282-91, 814 P.2d 652 (1991), in which he noted that the purpose of article I, section 12 was to prohibit favoritism and special treatment. The federal equal protection clause was framed in light of different concerns and was aimed at preventing discrimination against disfavored individuals or groups. *See Smith*, 117 Wn.2d at 283. Despite these differences, our Supreme Court has repeatedly held that the two provisions share the same purpose and

are substantially identical. *See DeYoung v. Providence Med. Ctr.*, 136 Wn.2d 136, 142, 960 P.2d 919 (1998).

In *Gossett v. Farmers Ins. Co.*, 133 Wn.2d 954, 976, 948 P.2d 1264 (1997), the court noted that although the textual differences between article I, section 12 and the federal equal protection clause do not compel an independent state analysis, the differences "suggest we should not foreclose the possibility that there may be a context where the state privileges and immunities clause should be independently examined[.]" *Accord DeYoung*, 136 Wn.2d at 142. Here, however, although the family emphasizes the textual differences between the two provisions, they do not explain why the state constitution's language provides greater protection in the context of their claim. *See id.* (rejecting the argument that the plaintiff's right to pursue a tort claim is specially protected under the state constitution).

Similarly, in examining the third *Gunwall* factor, an analysis of the constitutional and common law history of the state provision, the family does not discuss how the history of our state privileges and immunities clause supports their argument for enhanced protections. *Cf. Seeley v. State*, 132 Wn.2d 776, 789, 940 P.2d 604 (1997) (noting that although interpretations of the Oregon provision are helpful, the third *Gunwall* factor requires an analysis of the Washington constitutional provision at issue). In a separate section of their analysis, the family cites two Washington cases in which the courts addressed challenges to legislation under the privileges and immunities clause. In *State v. Carey*, 4 Wash. 424, 30 P. 729 (1892), the court addressed an equal protection challenge under both the state and federal constitutions. But because the court did not conclude that the state constitution provided greater protection, our Supreme Court has recently stated that *Carey* "has limited value in determining whether the state constitution should be considered as extending broader rights to state citizens than . . . the federal constitution." *Gossett*, 133 Wn.2d at 977.

In *State ex rel. Bacich v. Huse*, 187 Wash. 75, 80, 59 P.2d 1101 (1936), *overruled on other grounds by Puget Sound Gillnetters Ass'n v. Moos*, 92 Wn.2d 939, 603 P.2d 819 (1979), the court struck a salmon industry regulation that restricted gillnetting rights to persons who had previously held a license in certain years. In holding that the regulation constituted a prohibited special privilege, the court stated, "The regulation, if it may be so called, is founded upon mere fortuitous circumstances and makes a gratuitous selection of individuals who shall enjoy the use of common property to the exclusion of all others." *Id.* at 82. The court concluded that both the state and federal constitutions require that "[t]he distinctions giving rise to [a] classification must be germane to the purposes contemplated by the particular law and may not rest upon a mere fortuitous characteristic or quality of persons, or upon personal designation." *Id.* at 84. Here, the County's representation of its agents and employees is not a grant of special privilege based on "mere fortuitous" characteristics or personal designations, but instead rests on general grounds. Thus, we conclude that the County's inquest procedures do not raise the same issues concerning undue favor or special privileges that our courts have previously addressed under article I, section 12.

In their analysis of the fourth *Gunwall* factor, preexisting state law, the family does not discuss state law regarding inquest proceedings or the family's participation in such proceedings. *See, e.g.*, *DeYoung*, 136 Wn.2d at 143 (discussing prior law governing limitations on tort claims); *Gunwall*, 106 Wn.2d at 66 (history of state protection of electronic communications). We note that the provisions governing inquests in RCW 36.24 are present, virtually unchanged, in the 1854 territorial laws. *Carrick*, 125 Wn.2d at 138 (observing further that the coroner's inquest "has played an active role in our legal system for over a century."). And as discussed above, there is no indication from the statutes that a participant in an inquest proceeding has a right to counsel or would require counsel to protect a fundamental liberty interest because the inquest

is not, and traditionally has not been, a trial. The case law also does not indicate that our state's procedures for inquests have varied significantly from that of other jurisdictions. *See id.* at 138-39 & n.6, 144 n.9 (citing for support cases from other states and general treatises). Our state's conformity to general practice does not support the conclusion that our state laws have provided greater protections for participants in such proceedings.

The fifth *Gunwall* factor, structural differences between the federal and state constitutions, generally suggests that our state constitution provides broader protection than the federal constitution. *DeYoung*, 136 Wn.2d at 143. The sixth factor, whether the subject matter is of particular state or local concern, is also not at issue in this case. But although inquest proceedings are matters of local concern, a consideration of the first four *Gunwall* factors indicates that our state has not developed special protections governing such proceedings. More importantly, our state privileges and immunities clause does not appear to address the type of claim that Guy's family raises. We conclude that the family's argument does not adequately demonstrate why the state constitutional provision should be applied in this context, and we decline to apply independent state grounds to their claim.

The family next contends that under a federal equal protection analysis, this court should apply a heightened level of scrutiny to the challenged policies. Because the right of access to the courts has not, by itself, been recognized as a fundamental right, we reject the family's argument that their claim should be evaluated under strict scrutiny. *See Ford Motor Co. v. Barrett*, 115 Wn.2d 556, 562, 800 P.2d 367 (1990). In addition, although several important rights are implicated by the County's policy, including the family's ability to participate in the inquest and their right to know the circumstances surrounding Guy's death, the challenged policy does not distinguish among inquest participants on the basis of a suspect or

semisuspect class. Rather, as framed by the appellants, the County's denial of indigent representation distinguishes between participants based on the different interests they represent. Our courts have applied an intermediate level of scrutiny "only where [the challenged legislation] implicates both an important right and a semisuspect class not accountable for its status." *DeYoung*, 136 Wn.2d at 141 (citing *Griffin v. Eller*, 130 Wn.2d 58, 65, 922 P.2d 788 (1996) and *Westerman v. Cary*, 125 Wn.2d 277, 294, 892 P.2d 1067 (1994)) (additional citations omitted). Therefore, an intermediate level of scrutiny is also not appropriate.

■ Absent any implication of a fundamental interest or the use of a suspect or semisuspect classification, we review the challenged policies under the rational basis test. *See Gossett*, 133 Wn.2d at 979. Under this test, the challenged statute must be rationally related to a legitimate state interest and the party challenging the statute bears the burden of showing that it is purely arbitrary. *DeYoung*, 136 Wn.2d at 144 (stating that under this level of scrutiny, a statute "will be upheld unless the classification rests on grounds wholly irrelevant to the achievement of a legitimate state objective."). In the instant case, the County's denial of funds for indigent representation and its payment for representation of County agents and employees are directly related to the County's legitimate interest in apportioning its funds for indigent representation and protecting against any potential liability for the acts of its agents and employees.

In addition, we note that " 'Equal Protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made.' " *In re Detention of Dydasco*, 135 Wn.2d 943, 951, 959 P.2d 1111 (1998) (quoting *In re Personal Restraint of Young*, 122 Wn.2d 1, 45, 857 P.2d 989 (1993)). Thus, to show a violation of the provisions, a party " 'must first establish that the challenged act treats unequally two similarly situated classes of people.' " *Fell v. Spokane Transit Auth.*, 128

Wn.2d 618, 635, 911 P.2d 1319 (1996) (quoting *Cosro, Inc. v. Liquor Control Bd.*, 107 Wn.2d 754, 760, 733 P.2d 539 (1987)). Here, the family's participation and interest in the proceeding is fundamentally different from that of the participants whose representation the County has paid for with public funds. The County agents and employees involved in the inquest may have had important knowledge of Guy's death and may be civilly or criminally liable. The inquest was directed toward the acts and potential liability of the employees, and thus of the County itself. The family, in contrast, shares the interest of the public in determining the cause of Guy's death. Although the County's policies provide the family with the opportunity to participate in inquest procedures, their participation, unlike that of the witnesses', clearly cannot be compelled. We conclude that the constitutional guarantee of equal protection does not require the County to provide representation for the family of the deceased in such proceedings just because it pays for the representation of its agents and employees.

We affirm.

Cox, J., concurs.

ELLINGTON, J. (concurring) — I agree with appellants that the right to access to the courts is fundamental to our system of justice. Indeed, it is the right "conservative of all other rights." *Chambers v. Baltimore & Ohio R.R.*, 207 U.S. 142, 148, 28 S. Ct. 34, 52 L. Ed. 143 (1907). I also agree with appellants that meaningful access requires representation. Where rights and responsibilities are adjudicated in the absence of representation, the results are often unjust. If representation is absent because of a litigant's poverty, then likely so is justice, and for the same reason.

As the majority cogently points out, however, this case does not involve an adjudication of rights or responsibilities. I therefore concur in the result.

The majority also is correct that our state supreme court has not viewed the right of access as carrying a right to

910

representation at public expense in the absence of statute, unless fundamental liberty interests are at stake in the litigation. *See In re Dependency of Grove*, 127 Wn.2d 221, 237, 897 P.2d 1252 (1995). While I would urge a broader view of the circumstances which call for representation at public expense (*see, e.g., Housing Auth. v. Saylors*, 87 Wn.2d 732, 744, 557 P.2d 321 (1976) (Horowitz and Utter, JJ., dissenting)), this case does not present those issues.

Review denied at 141 Wn.2d 1003 (2000).